Lillian S. JAMES, et al.

v.

**TENNESSEE VALLEY AUTHORITY,**
**et al.**

**Civ. No. 3–82–76.**

United States District Court,
E. D. Tennessee, N. D.

April 22, 1982.

---

Dorothy B. Stulberg, Oak Ridge, Tenn., for plaintiffs.

Herbert S. Sanger, Jr., Gen. Counsel, James E. Fox, Assoc. Gen. Counsel, Justin M. Schwamm, Sr., Asst. Gen. Counsel, Robert C. Glinski, Brent R. Marquand, Tennessee Valley Authority, Knoxville, Tenn., for defendants.

### MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Plaintiffs brought this action pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and implementing regulations to require defendant Tennessee Valley Authority (TVA), its directors and its general manager to prepare an environmental impact statement (EIS) in connection with a proposed inland port. Both declaratory and injunctive relief are sought. The Court denied plaintiffs' request for a preliminary injunction on March 25, 1982. The case is now before the Court on defendants' motion to dismiss or, in the alternative, for summary judgment. Defendants' motion is supported by the affidavits of Roosevelt T. Allen and

Ronald L. Conley. Seven exhibits are attached to Allen's affidavit. Plaintiffs have filed a brief supported by three exhibits in opposition to defendants' motion. Plaintiffs' counsel has also filed her affidavit. Defendants have filed a reply brief.

On December 15, 1980, Inland Ports, Inc. (Inland), requested that TVA convey certain landrights across property lying along TVA's Watts Bar Reservoir located in Roane County, Tennessee. Inland sought the landrights in connection with the construction of a public use port facility which would be adjacent to and would utilize 4.2 acres of the existing Harriman, Tennessee Industrial Park. The facility would be used to load barges with coal hauled by truck to the port. Inland also requested TVA to issue a permit in accordance with Section 26a of the TVA Act, 16 U.S.C. § 831y–1. After receiving Inland's requests, the Corps of Engineers, TVA and the State of Tennessee jointly issued a public notice to solicit comments on Inland's requests and proposal. Comments and suggestions received in response to the notice were used by TVA to formulate the scope of the evaluations which were conducted in order to prepare the draft Inland Environmental Assessment (EA). On July 9, 1981 TVA and the Corps of Engineers held a public hearing. Copies of the notice of the meeting were sent directly to persons who had responded to the earlier public notice and to relevant Federal, State and local agencies. The notice was also published in Knoxville and Harriman newspapers. Copies of the draft Inland EA were made available at the July 9, 1981 hearing and additional copies were distributed to persons who subsequently requested a copy in response to the notice and hearing. The Court has been furnished with a copy of the transcript of the hearing. Some comments relating to environmental effects and the draft Inland EA received from the public and from Federal, State, and local agencies were considered and responded to by TVA in the final Inland EA. Comments were also solicited from the United States Department of Housing and Urban Development, the United States Fish and Wildlife Service, the United States Soil

Conservation Service, the United States Environmental Protection Agency, and the Tennessee State Planning Office. The Court has been furnished with a copy of the final Inland EA. At the conclusion of the environmental assessment process, TVA concluded that the proposed port facility would not significantly affect the quality of the human environment.

On October 7, 1981, Inland's request for the easement was presented to TVA's Board of Directors for action at a regularly scheduled meeting in Knoxville. The meeting was open to the public, and notice of the meeting's agenda was published. At the meeting, members of the public, including plaintiffs' counsel, were given the opportunity to address the Board. In response to the concerns raised by plaintiffs' attorney, the Board directed TVA's Land Branch to sell Inland the landrights with conditions to further ensure that potential effects of the port facility were minimized. On October 27, 1981 TVA granted Inland the requested easement to construct, operate, and maintain the port facility. The easement required that Inland control all emissions of pollutants that might be discharged directly or indirectly, that it accept delivery of coal by trucks at the terminal only between the hours of 7 a.m. and 7 p.m., that all trucks delivering coal or other materials be operated and maintained so as to prevent noise generated by the trucks from exceeding a level of 82 dBA measured at a distance of 50 feet from the primary access road leading to the terminal, and that all operators or owners of trucks delivering coal to the terminal comply with applicable highway laws and regulations governing vehicle weight. On October 20, 1981, the requested section 26a permit was issued.

## DISCUSSION

Defendants' first contention is that the action should be dismissed because plaintiffs failed to join Inland, an indispensable party, as a defendant in this case. Fed.R. Civ.P. 19(a). At the hearing on the preliminary injunction the Court ruled that Inland should be joined as a defendant. Although plaintiffs' counsel agreed to add Inland as a defendant, counsel has not done so.

Turning to the merits of the case, we must first determine the appropriate standard for reviewing TVA's decision not to prepare an EIS. This question was raised in *Boles v. Onton Dock, Inc.*, 659 F.2d 74 (6th Cir. 1981), and was answered this way:

> The primary issue raised by appellants concerns the scope of review of the Corps' decision that an Impact Statement was not necessary. Appellants contend that the proper standard of review is whether the Corps' decision was reasonable, and not whether it was arbitrary and capricious. No matter what standard courts have used, they have looked to see whether the Corps made a reasoned determination.

659 F.2d at 75.

Defendants contend that they have properly complied with the NEPA and applicable regulations and that these laws do not require an EIS in this case. They thus argue that their actions were neither arbitrary nor capricious; that they made a reasoned determination.

The NEPA requires all federal agencies to include an EIS "in energy recommendation or report on ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). TVA's procedures implementing the NEPA require the preparation of an EA. The purpose of the EA is to "provide sufficient data and analysis for determining whether to prepare an EIS or a Finding of No Significant Impact." 45 Fed.Reg. 54,513. Another TVA procedure implementing the NEPA lists nine actions that normally require an EIS. One of these actions is a port facility. *Id.* Whether or not a proposed action significantly affects the quality of the human environment is to be determined by considering (1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its con-

tribution to existing adverse conditions or uses in the affected area. *Hanly v. Kleindienst*, 471 F.2d 823 (2nd Cir. 1972) *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

As previously noted, TVA prepared an EA and on that basis concluded that the port facility would not have a significant environmental impact. Therefore, an EIS was not prepared. Plaintiffs argue that the construction and operation of the barge facility will significantly affect the quality of the human environment and raise three areas of concern in their brief.

Plaintiffs' counsel strongly asserts that there are genuine issues of material fact which preclude summary judgment in this case. Plaintiffs must raise "substantial environmental issues" or demonstrate "inadequate evidentiary development" in order to successfully resist defendants' motion. *Mid-Shiawassee County Concerned Citizens v. Train*, 408 F.Supp. 650, 654 (E.D.Mich. 1976), *aff'd.*, 559 F.2d 1220 (6th Cir. 1977). *Noise from the Construction and Operation of the Port Facility.*

The noise complained of by plaintiffs comes from two sources: trucks hauling coal to the port and the operation of the port. TVA conducted a noise survey to determine the noise level along the access road and near the port. The survey is described, in pertinent part, as follows:

> To evaluate the current noise level in the community along the access road and to determine if increased truck traffic would result in unacceptable community noise levels, a community noise survey was conducted along the access road on April 9–10, 1981 . . . . Baseline sound levels were measured over a 24-hour monitoring period at residential houses 50–100 feet from the access road. Representative noise samples of loaded trucks traveling at a speed of 25–55 mph were measured at a distance of 50 feet. At 25 mph, the truck passage noise level was determined to be 79 dBA when the truck passed directly opposite the receiver. At a distance of 1,500 feet on either side of the receiver, the noise level was compara-

> ble to baseline. Based on 60 trucks per day (120 passages through the community) between 7 a.m. and 7 p.m., the extrapolated $L_{dn}$ would be 63 dBA. When compared to the current baseline noise level, (62 dB) hauling activities should have a negligible effect on community noise level since the extrapolated noise levels are below the Department of Housing and Urban Development's (HUD) 65 dBA day-night equivalent sound level for residential land use. (See letter from Richard C. Becker to Roosevelt Allen, Appendix I.) Although daytime traffic along the road will increase by approximately 60 vehicles, the baseline sound level is expected to increase only 2 dB at points 50 feet from the roadside.

> Construction and operational noise levels are expected to be slightly higher but comparable to existing ambient sound levels. Onsite noises from coal processing and handling will be controlled through the use of vegetative and artificial noise screens where appropriate. The coal crusher will be housed and located below ground level to minimize noise problems. Increased vehicle traffic along the access road, combined with plant operation, is expected to result in time-averaged sound levels only 1 dB higher than existing baseline sound levels. However, the increased frequency of intermittent noise due to truck passage is expected to be considered intrusive by residents near the access road.

EA at 23, 25. Plaintiffs challenge both the survey and TVA's conclusions. Plaintiffs argue that TVA failed to test noise levels at the port's boundaries, which are within 200 feet of a dwelling; used an average noise level to assess environmental effects, rather than testing the effects of intermittent noise levels of 79 dBA when the trucks passed; failed to consider the physiological effects of noise on residents in the area; and used 65 dBA as the acceptable noise level for residential areas, rather than the 55 dBA considered as acceptable when TVA assessed the environmental impact of a coal-loading terminal on Melton Hill Reservoir.

Many of the criticisms raised by plaintiffs were considered by TVA in response to comments on the draft EA. The comments and responses are contained in Appendix J of the final EA. In response to comment 4 concerning Noise, Traffic and Safety, TVA explained that time-averaged sound levels are used by the United States Department of Housing and Urban Development (HUD) and the Department of Transportation. HUD reviewed the noise survey results in this case and found that the anticipated noise levels were reasonable. EA, Appendix I. In response to comment 6, which raised questions concerning the effect of the noise level on residents, TVA noted that "[n]oise can have physiological effects, but the kind and extent of such effects have not been assessed in detail outside of an occupational/industrial setting." It was further noted that although passing trucks with a peak noise level of 79 dBA might be considered "intrusive" by those nearest the source (a point which counsel makes in her affidavit), the 79 dBA peak level for trucks was less than the 93 dBA peak noise level recorded in the survey of the existing community noise level. In response to comment 5, which asked about noise levels caused by the operation of the port, TVA pointed out the sources of the noise and stated that, based on TVA's experience, the operational noise level should not exceed 63 dBA. Finally, TVA's use of a 65 dBA standard rather than 55 dBA is consistent with HUD regulations. 24 C.F.R. § 51.101(a)(8).

■ TVA's conclusion that the noise caused by the hauling of coal and operation of the port will not have a significant impact on the human environment is not arbitrary or capricious. TVA considered all the concerns voiced by plaintiffs and made a reasoned determination.

*Fugitive Dust from Coal Trucks and Port Operation.*

■ Plaintiffs contend that coal dust will cause a significant environmental impact if Inland fails to meet its dust control commitments. TVA found that "some minor air quality degradation will occur," EA at 28, but concluded that it would not be significant. It was predicted that fugitive dust would be reduced by the use of water sprays at the crusher and other transfer points. *Id.* at 27. The grant of easement is conditioned upon Inland's controlling all emissions of pollutants and compliance with applicable federal, state and local pollution control standards and requirements. These measures should keep harmful impacts to a minimum. *Environmental Defense Fund v. Tennessee Valley Authority*, 371 F.Supp. 1004, 1010 (E.D.Tenn.1973), *aff'd* 492 F.2d 466 (6th Cir. 1974). TVA's conclusion that fugitive dust will not have a significant impact on the environment is supported by the record.

*Reduction in Property Values and Effect on the Residential Area.*

TVA made the following findings concerning effects of the port:

3.2.4 *Recreation and Aesthetic Resources*

There are no known or proposed recreation development plans that would be adversely affected by the proposed barge terminal. This portion of the Emory River receives light to medium fishing pressure; however, only approximately 1,300 linear feet of shoreline would be affected. While barge traffic may occasionally disturb fishermen in the relatively narrow confines of the river (182 to 210 feet wide), overall there would be no significant impact to recreation.

This area has no unusual or unique scenic or natural features. However, some of the terminal facilities such as the coal stockpile area and a portion of the conveyor would be visible to a few of the residents of Lakeview and Fisk Heights Subdivisions. Facility layout, i.e., locating the coal storage pile and coal processing facilities in the hollow that runs through the site, should minimize visual impact. In addition, vegetation (primarily loblolly pine) would be planted between the plant facilities and the access road. This vegetation should effectively screen the coal facilities from adjoining subdivisions.

### 3.2.5 *Residential Property Values*

The development of the proposed coal facility is expected to have negligible impacts on residential property value. Any loss in value has probably already occurred because of the aging of the housing stock and the existing industrial zoning of the adjoining area. Future residential property values should remain stable with some increase in nonresidential property value.

*Id.* at 21–22. Plaintiffs contend that TVA's conclusions have no support in the record and are inconsistent with the conclusions of TVA in the Melton Hill EIS. The land where the Harriman Industrial Park is located is not zoned industrial. That is, however, how the land is being used. The City of Harriman sold the land to Inland for construction of the port. TVA was, therefore, correct in stating that the residences adjoin an existing industrial area.

■ Plaintiffs rely on the EIS prepared in connection with a railroad to barge coal-loading terminal on Melton Hill Reservoir to show what TVA should have done in this case. It was projected that the Melton Hill terminal would be handling 1,800,000 tons of coal the first year of operation, and 4,400,000 tons of coal per year by 1989. TVA EIS Proposed Sale of Permanent Easement for Coal-Loading Terminal on Melton Hill Reservoir at 4. The area was zoned for industrial use, but opposite the site were residential areas with a "breathtaking" view and shoreline recreation and picnic facilities. *Id.* at 20–23. The Inland port is expected to move approximately 400,000 tons of coal in its first year of operation. EA at iii. Differences in size of the two projects and in the surrounding areas may account for TVA's preparing an EIS in one and not the other. Moreover, when there is no significant impact on the physical environment, as is true in the present case, socio-economic effects, such as effects on property values, are insufficient to trigger an agency's obligation to prepare an EIS. *Image of Greater San Antonio v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978); *Breckinridge v. Rumsfeld*, 537 F.2d 864 (6th Cir. 1976), *cert. denied*, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977).

### Other Issues

■ In the complaint, plaintiffs also express concern over increased traffic hazards; deterioration of the existing access road; increased turbidity levels and siltation in Watts Bar Reservoir; and the impact on agricultural land and on flood plains. These have not been briefed by plaintiffs, but were considered by TVA in the EA and found not to pose significant environmental problems. The record supports TVA's findings. In their brief, plaintiffs challenge TVA's analysis of the economic effects of the port, but do not elaborate other than to question TVA's reliance on a study conducted in Memphis, Tennessee. The EA shows that the Memphis study was only used by Inland to project its expenditures, and not to project other economic impacts on the region. *Id.* at 6–8, Errata Sheet.

### CONCLUSION

In the opinion of the Court, TVA's decision that the proposed port facility would not significantly affect the human environment was not arbitrary or capricious. TVA made a reasoned determination based on a comprehensive EA. Therefore, TVA was not required to file an EIS. This is not a case where TVA's analysis consists of unsupported conclusions which deny the reader an opportunity to evaluate TVA's reasoning. *See Environmental Defense Fund v. Tennessee Valley Authority*, 339 F.Supp. 806, 809 (E.D.Tenn.1972), *aff'd* 468 F.2d 1164 (6th Cir. 1972). In this case TVA gave thorough consideration to the environmental issues and adequately developed the record. Those opposing the project were allowed to state their positions and were successful to the extent that TVA placed conditions on the grant of easement and took other steps to accommodate them. The Court has carefully examined the record in this case and concludes that there are no genuine issues as to any material fact. Defendants are entitled to summary judgment. *Boles v. Onton Dock, Inc., supra;*

*Mid-Shiawassee County Concerned Citizens v. Train, supra.*

For the reasons stated, it is ORDERED that defendants' motion for summary judgment be, and the same hereby is, granted. It is further ORDERED that this case be, and the same hereby is, dismissed.

Order Accordingly.