[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12819

_____

D. C. Docket No. 4:10-cv-00267-BAE-GRS

GEORGIA RIVER NETWORK,
AMERICAN RIVERS,

Plaintiffs-Appellants,

versus

U.S. ARMY CORPS OF ENGINEERS,
LT. GENERAL ROBERT L. VAN ANTWERP,
U.S. Army Corps of Engineers, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(April 19, 2013)

Before JORDAN and ANDERSON, Circuit Judges, and HORNBY,* District Judge.

PER CURIAM:

_____

    * Honorable D. Brock Hornby, United States District Judge for the District of Maine,
sitting by designation.

Plaintiffs Georgia River Network and American Rivers appeal the district court's summary judgment order in favor of the United States Army Corps of Engineers ("Corps") and the Grady County Board of Commissioners regarding the issuance of a permit under Section 404 of the Clean Water Act to construct a 960-acre fishing lake in Grady County, Georgia.  Specifically, Plaintiffs argue that the Corps was arbitrary and capricious in granting the permit by ignoring contradictory record evidence regarding the need for the project and the impact of the project on jurisdictional wetlands.  In its comprehensive opinion, the district court set out the governing law and the procedures followed by the Corps in complying with the law during the permit process.  Plaintiffs do not challenge the legal framework as set out by the district court; therefore, we accept the same as the law of the case.  After a thorough review of the record and with the benefit of oral argument, and for the reasons that follow, we affirm.

## I.  Project Need

Plaintiffs argue that the Corps's actions in calculating the need for the proposed lake were arbitrary for a number of reasons: first, that the Corps failed to independently evaluate the 2002, 2006, and 2007 studies conducted by Dr. Michael Maceina ("Maceina studies"), instead relying on Grady County's characterization of the studies; second, that the Corps failed to explain its finding of need in light of

contradictory record evidence; third, that the Corps was arbitrary in failing to account for the fact that Florida residents would fish at a lesser participation rate in a Georgia lake; and finally, that the Corps arbitrarily reduced the 2007 needs figure by twenty percent without providing an explanation for this action.

We reject Plaintiffs' argument that the Corps was arbitrary because it did not independently evaluate the Maceina studies. The Corps's conclusion that Grady County had sufficiently demonstrated a need for the project was not based solely on the County's representations of the Maceina studies, and was certainly not based solely on the 2002 report. Rather, the Corps sought guidance from the Georgia Department of Natural Resources ("DNR") in confirming that the 2006 Maceina study "utilized techniques recognized by [Ga DNR] staff as appropriate for estimating fishing demand." As Plaintiffs acknowledge, the same methodology was applied in the 2002, 2006, and 2007 studies. Further, responding to agency comments questioning the need for the project, the Corps had the County isolate the need in Grady County alone. Finally, the Corps reduced the 2007 figure in response to additional concerns regarding the needs assessment. Based on this record evidence, the Corps did not blindly rely on Grady County's representations of need for the project but rather took reasonable steps to independently assess the public need for the fishing lake.

3

We reject Plaintiffs' second argument – i.e., that the Corps was arbitrary in failing to explain how it found a need for the lake in light of contradictory record evidence (i.e., the 2002 study).  Under *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983), courts should not defer to an agency's unsupported reasoning which is directly contradicted by the record.  However, not all of the evidence in the record is required to support the agency's decision.  *Envtl. Coal. of Broward Cnty., Inc. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987) ("It is enough that the Corps considered all relevant factors and that there is credible evidence in the record to support its action.").  We reject Plaintiffs' argument that the Corps was arbitrary in failing to explain its decision in light of allegedly contradictory evidence in the record because we find that the 2002 study is not inconsistent with the 2006 and 2007 studies.  The 2002 study was based on an earlier Fish and Wildlife Service ("FWS") study and used earlier population figures and fishing participation rates than the later studies.  The increased population and participation rate figures used in the 2006 and 2007 studies are supported in the record evidence.  The use of these more current figures amply explains any inconsistency.[1]  Moreover, during

---

[1]      Wholly aside from the significant fact that the 2006 and 2007 studies were based on updated population figures and participation rates, even the 2002 study itself showed a deficit of fishing opportunities when the three Florida lakes were removed.  Dr. Maceina justified omitting the Florida lakes because the lakes were unavailable because of droughts and fish kills for twenty percent of the time.

4

the permit process there was no specific challenge based on the 2002 study. Because the Corps had sufficient reasons to conclude that there was a need for the project based on the record, we cannot conclude that its decision was arbitrary.

We also reject Plaintiffs' third argument – i.e., that the Corps was arbitrary in failing to account for the fact that Florida residents would fish at a lesser participation rate in a Georgia lake. We note initially that the cost of a non-residential fishing license for Georgia is likely not high enough to constitute a significant barrier.[2] Plaintiffs rely on the 2001 FWS survey which indicated that only two percent of all fishing trips taken by Florida residents were taken out of state and only four percent of fishing trips taken in Georgia were taken by nonresidents. We find, as a matter of common sense, that such statistics are not applicable here where the proposed lake is located at the state boundary and will naturally draw its clientele from nearby Florida and Georgia residents.[3]

Furthermore, while it is true that distance to any fishing opportunity will obviously affect participation, we cannot conclude that the Corps was arbitrary in relying upon Dr. Maceina's 2006 and 2007 studies and the statistics they used.

---

[2] When the permit was granted in 2010, the cost of an annual nonresident Georgia fishing license was $45.

[3] Additionally, we recognize, as the district court did, that while commentators challenged generally whether Floridians would fish at the same rate as Georgians, "[n]o agency or public commenter raised concerns about the specific FWS participation rates." DC Doc. 109 at 6.

5

Both studies calculated a gross demand for fishing by <u>all</u> residents in the 50-mile study area (Georgia and Florida), using a DNR-accepted methodology.  Both studies take into account all of the fishing opportunities provided by the three Florida lakes and the several streams and rivers in Florida.  Thus, the gross demand for fishing is reduced by the opportunities for fishing in Florida, and the unmet need is thereby reduced.  In other words, the studies do in fact take into account that Florida residents will fish at a lesser rate than closer Georgia residents.

Finally, we reject Plaintiffs' argument that the Corps was arbitrary in reducing the unmet demand figures from the 2007 study by twenty percent.  As the Corps explained in its final decision document, it did so based on information provided by the EPA regarding "a twenty percent decline in the number of fishing licenses issued in the United States."  We cannot say, as a matter of law, that the Corps's decision to apply this reduction to the Grady County needs figure was arbitrary.  In fact, this reduction presents a more conservative assessment of the County's need for the proposed fishing lake.

## II.  Wetland Delineation

Plaintiffs do not challenge the district court's findings as to the procedures followed by the Corps in identifying 129 acres of jurisdictional wetlands, with one exception.  Their sole challenge on appeal to the Corps's delineation of impacted

6

wetlands focuses on a 1989 Black Creek project with respect to which Georgia's DNR estimated at the time that the project might impact 159 acres of wetlands. Plaintiffs argue that those 159 acres fall within the footprint of the proposed lake. Plaintiffs also make the conclusory assertion that none of those 159 acres are included in the 129 acres of jurisdictional wetlands identified by the Corps. Plaintiffs argue that the Corps never explained sufficiently why more wetlands in this area were not impacted and thus that the Corps failed to explain away contradictory evidence in the record. In the district court (and on appeal) this challenge to the Corps's wetland delineation is based on a comment submitted by Keith Parsons (of the Wildlife Resources Division of Georgia's DNR) during the notice and comment period.[4]

The district court gave this challenge careful attention, noted that the assessment of impacts on wetlands is a technical matter falling squarely within the expertise of the Corps, and concluded that the decision of the Corps is subject to a highly deferential standard of review. The court was correct to conclude that technical agency decisions, such as wetland delineations, are given substantial deference. *See Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103, 103 S. Ct. 2246, 2255 (1983) ("[A] reviewing court must remember that the

---

[4] Although other commentators referred to Black Creek, the record indicates that Parsons was the primary source and basis for the other comments.

[agency] is making predictions, within its area of special expertise . . . .  When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."); *Citizens To Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S. Ct. 814, 824 (1971) ("The court is not empowered to substitute its judgment for that of the agency."). Ultimately, the district court held that while the "wetland delineation in this case is not a model of clarity," the district court could nevertheless "decipher the delineation process based on the record."  DC Doc. 109 at 28; *see Bowman Transp., Inc., v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86, 95 S. Ct. 438, 442 (1974) ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.") (internal citation omitted).

Plaintiffs argue, in a conclusory manner, that the district court erred by giving undue deference to the Corps's decision where the record showed that the Corps was silent on any additional Black Creek wetlands.  We cannot conclude that the district court erred.  Like the district court, even assuming that the Corps's decision is one of "less than ideal clarity," we find that the path by which the Corps reached its decision "may reasonably be discerned." *Bowman*, 419 U.S. at 285-86, 95 S. Ct. at 442.  We first note that Parsons's comment about the 1989 Black Creek

8

project came with significant caveats. The comment itself revealed that the 159 acres of wetlands was a mere estimate and that the site was never officially delineated or verified on the ground. The estimate was based on unpublished soil data and "known vegetation community types." Moreover, Parsons's comment does not support Plaintiffs' assertion that the wetlands estimated to exist in 1989 fall wholly outside the 129 acres of wetlands identified by the Corps. Rather, Parsons said merely that the "delineation map for the current proposal fails to provide any delineation data for *most* of the Black Creek *drainage* that would have been in the [1989 proposal]." (emphasis added). Of course, "drainage" does not necessarily mean jurisdictional wetlands, and, even with regard to drainage, Parsons said only "most."[5] Therefore, Parsons's comment does not constitute contradictory evidence of additional wetland acreage in the proposed lake, but merely suggests the possibility that additional wetland acreage may exist in Black Creek.

There is considerable doubt that Parsons's comment is sufficiently specific

---

[5]    The site of the 1989 proposal is just upstream from a very substantial part of the 129 acres of wetlands delineated by the Corps that extends up Black Creek from its confluence with Buss Creek. Contrary to Plaintiffs' argument, the record does not support Plaintiffs' conclusory assertion that substantial parts of the 159 acres contemplated in 1989 may not in fact be included in the 129 acres officially delineated now. More significantly, the record is clear that the Corps repeatedly studied the aerial photography of the area, and it is not credible to think the Corps did not study the aerial photography of the 1989 Black Creek project given its proximity to the 129 acres delineated.

to impose a mandatory duty on the part of the Corps to definitively disprove the possible existence of additional wetlands. *See Van Abbema v. Fornell*, 807 F.2d 633, 642 (7th Cir. 1986) ("The Corps may rely on reports prepared by outsiders or applicants, but as we have noted, when such information is specifically and credibly challenged as inaccurate, the Corps has an independent duty to investigate."). Even assuming that the challenge is sufficiently specific, the record indicates that the Corps repeatedly responded to criticism and comments by reevalaution of aerial photography and site visits.[6] In particular, the June 26, 2007, site visit was expressly in response to "agency comments and after reviewing more recent aerial photography." DC Doc. 109 at 26. And Parsons himself participated in that site visit. In Parsons's July 9, 2007, letter to the Corps, he was critical of the site visit in numerous respects but he did not suggest that the site visit should have included the site of the 1989 Black Creek project. Rather, his sole reference to Black Creek was: "There remains little description of hydric features in the upper pool of Black Creek." Furthermore, far from suggesting that substantial additional acreage of wetlands might exist farther up Black Creek, Parsons's letter suggested

---

[6]        Indeed, the record strongly indicates that the probable site of the 1989 Black Creek project was examined by the Corps, at least by study of aerial photography, and very likely by site visits. *See, e.g.*, Admin Record, Tab A, Tab 1 (stating that on August 4, 2006, the Corps conducted "on-site field checking of aerial photography on Black Creek"); Tab D, Tab 2 (noting that the Corps worked with Grady County's experts to "revise[] the delineation in the field"); Tab E, Tab 5 (mentioning a February 16, 2006, field visit made with a Corps's biologist).

10

that a more extensive site visit might have uncovered small additional pockets: "The inability of photo interpretation to pick up forested wetlands of 3 to 5 acres in size . . . continues to plague a final delineation determination." Therefore, we conclude that there is sufficient evidence in the record that the Corps investigated and responded to the challenge regarding the possibility of additional wetland acreage in Black Creek.

Because Parsons's comment about the 1989 Black Creek project and the possibility of additional wetlands acreage just upstream on Black Creek certainly does not constitute any evidence of additional wetlands, and because the record indicates that the Corps adequately addressed the comment, and in light of the substantial evidence supporting the Corps's delineation,[7] and in light of the considerable deference owed to the Corps in this regard, we cannot conclude that Plaintiffs have carried their burden of establishing that the Corps's decision was arbitrary and capricious. Plaintiffs have not established that the Corps "has relied on factors which Congress had not intended it to consider, entirely failed to

---

[7] The County's experts submitted delineation maps, and represented that they were based on aerial photography and had been ground truth checked. The Corps's project manager verified that the County expert had complied with the Corps's Wetland Delineation Manual, and worked with the County expert toward modifications. In addition to addressing Parsons's comment about the 1989 Black Creek project, the Corps addressed comments from other agencies and groups resulting from the public notice. For example, the Corps's reexamination of aerial photography and the June 26, 2007, site visit resulted in the identification by the Corps of twenty-six additional acres of wetlands.

11

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S. Ct. at 2867.

For the reasons discussed above, the district court's decision is

AFFIRMED.