**AIRPORT COMMUNITIES COALITION, Plaintiff,**

v.

**Colonel Ralph H. GRAVES, Commander and District Engineer of the Seattle District, United States Army Corps of Engineers; United States Army Corps of Engineers, an agency of the United States government; and Port of Seattle, a municipal corporation, Defendants.**

No. C02–2483R.

United States District Court, W.D. Washington, at Seattle.

Aug. 18, 2003.

1208

Adam J. Berger, Schroeter Goldmark & Bender, Kevin L Stock, Helsell Fetterman LLP, Seattle, WA, for Plaintiff.

Laurie Kathryn Beale, Stoel Rives LLP, Seattle, WA, Lori Caramanian, U.S. De-

partment of Justice, Enrd General Litigation, Washington, DC, Peter J. Eglick, Helsell Fetterman LLP, Seattle, WA, Beth S. Ginsberg, Stoel Rives LLP, Seattle, WA, Traci M. Goodwin, Port of Seattle, Legal Department, Seattle, WA, Kent E. Hanson, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, Siri Coates Nelson, U.S. Army Corps of Engin, Seattle, WA, Thomas L. Sansonetti, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Linda J. Strout, Port of Seattle, Legal Department, Seattle, WA, for Defendants.

Joan M. Marchioro, Attorney General's Office, Olympia, WA, David K. Mears, Attorney General's Office, Social & Health Services, Seattle, WA, for Amicus.

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

ROTHSTEIN, District Judge.

THIS MATTER comes before the court on cross motions for summary judgment. Having reviewed the pleadings filed in support of and in opposition to these motions, and having heard oral argument, the court finds and rules as follows:

**I. BACKGROUND**

As part of its Master Plan Update ("MPU") to the Seattle–Tacoma International Airport, the Port of Seattle has proposed the construction of an 8,500 foot third runway and related improvements collectively known as the Third Runway Project ("3RW Project"). The proposed project requires 23.64 million cubic yards

of fill, see AR 62374, and will fill all or portions of 50 wetlands. AR 52375. Before such filling takes place, however, the Army Corps of Engineers must first issue a Clean Water Act ("CWA") Section 404 permit to the Port. 33 U.S.C. § 1344.

On December 13, 2002, the Army Corps of Engineers issued such a permit to the Port. Plaintiff, the Airport Communities Coalition ("ACC"),[1] immediately filed this suit seeking judicial review under the Administrative Procedures Act, 5 U.S.C. §§ 701–706. The parties agreed that no work would proceed on the project pending the outcome of this case. See Stipulation and Order re: Briefing Schedule and Preliminary Injunction (Dec. 13, 2002). The parties have now moved for summary judgment. The parties also have moved to strike various extra-record submissions.

**II. DISCUSSION**

*A. Standard of review*

A court may reverse a final decision of an administrative agency where the final action is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The scope of review under this standard "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). An agency decision will be upheld as long as there is a "rational connection between the facts found and the choice made." *Id.* (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)); *see also Gilbert v. Nat'l Transp. Safety Bd.,* 80 F.3d 364, 368 (9th Cir.1996); *Friends of the Earth v. Hintz,* 800 F.2d 822, 831 (9th Cir.1986) ("court may not set aside agency action as arbi-

**1.** ACC was created by an interlocal government agreement entered into by the Cities of Burien, Des Moines, Federal Way, Normandy Park, and Tukwila and the Highline School District to represent their interests collectively in matters relating to the 3RW Project.

trary or capricious unless there is no rational basis for the action"). In reviewing the agency's explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (citing *Bowman Transp. Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) and *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

■ In conducting this review, the "focal point . . . should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Review may be expanded beyond the record, however, if it is necessary to explain agency decisions. *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988). In the Ninth Circuit, extra-record materials are allowed (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, or (3) when supplementing the record is necessary to explain technical terms or complex subject matter. *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 704 (9th Cir.1996). Extra-record documents may also be admitted "when plaintiffs make a showing of agency bad faith." *Nat'l Audubon Soc. v. United States Forest Serv.*, 46 F.3d 1437, 1447 n. 9 (9th Cir.1993). All

of these exceptions are provided in order to ensure the integrity of the administrative process.

### B. *Motions to strike*

In support of its motion for summary judgment, ACC submits the declaration of Dr. Stephen Hockaday, ACC's expert on aircraft operation forecasting, in which he summarizes and attaches new data and information that have become available since the Corps issued its decision on December 13, 2002. That information includes, *inter alia*, newly published forecasts by the FAA and new air traffic data from the Port. Defendants have moved to strike this declaration as extra-record evidence.

■ The information in Hockaday's declaration does not fit into any of the exceptions provided by the Ninth Circuit for allowing extra-record material. ACC contends, however, that such extra-record information should be admissible, especially in this case, where the new information so "clearly" calls into question the underlying assumptions and facts upon which the Corps' decision to issue the permit are based. ACC relies on *Association of Pacific Fisheries v. EPA*, 615 F.2d 794 (9th Cir.1980) for the proposition that "[i]f the studies showed that the Agency proceeded upon assumptions that were entirely fictional or utterly without scientific support, then post-decisional data might be utilized by the party challenging the regulation." [2] 615 F.2d at 812 (citing *Am. Petroleum Inst. v. EPA*, 540 F.2d 1023, 1034 (10th

---

2. ACC also relies on dicta in *Esch v. Yeutter*, 876 F.2d 976 (D.C.Cir.1989) for a similar proposition that extra-record information is admissible when the information demonstrates that the agency decision was correct or not. 876 F.2d at 991. In *Esch*, procedural defaults by the agency prevented the court from determining whether the agency considered all the relevant factors. The court, therefore, allowed the record to be supple-

mented. *Id.* at 993. Courts applying *Esch*, however, have distinguished it on its facts. For instance, in *Lake Pilots Ass'n, Inc. v. United States Coast Guard*, 257 F.Supp.2d 148, 164 (D.D.C.2003), the court held that extra-record information was not admissible because unlike *Esch*, there had been no procedural violations that affected the existing record.

Cir.1976) ("After promulgation, events indicating the truth or falsity of agency predictions should not be ignored.")). Even under that standard, however, ACC's evidence is not admissible in the present case. Here, the extra-record information represents new information that was not available at the time the Corps made its decision. If the information had been available within that time frame, the court could then use that information to determine whether the Corps acted arbitrarily and capriciously in not considering that information as a relevant factor. Likewise, if the new information revealed that the information in the record was wrong at the time that it was put in the record and considered by the Corps, then the evidence would be admissible.

Neither of these situations, however, is the case here where the Corps did not and could not have considered the extra-record information because it did not exist at that time. Instead, the new information represents "Monday morning quarterbacking." If the court were to consider this new information in an arbitrary and capricious analysis, the court would effectively transform that analysis into *de novo* review, a level of review for which this court is not authorized. *See* 5 U.S.C. § 706 (establishing standard of review for agency action). Rather, the appropriate procedure is to submit the new information to the Corps so that it can reconsider the decision to issue the permit. (In fact, ACC has done exactly that—request that the Corps reconsider the permitting decision.)

Consequently, to the extent that Dr. Hockaday's declaration contains extra-record information, it is stricken.[3] *Rybachek v. EPA,* 904 F.2d 1276, 1296 (9th Cir.1990) (quoting *Pacific Fisheries* that it is not "appropriate ... for either party to use post-decision information as a new rationalization either for sustaining or attacking the Agency's decision"); *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1160 (9th Cir.1980) ("Consideration of the evidence to determine the correctness or wisdom of the agency's decision is not permitted.").

The Port also has submitted extra-record information. Exhibit E of Laurie Beale's declaration consists of extra pages from a Washington Department of Ecology report on background soil concentrations for various metals. Apparently, only the report's executive summary was included in the record. ACC objects to this submission on the basis that the selected pages now being submitted comprise extra-record information. Such a submission, however, falls well within the exceptions provided for by the Ninth Circuit. It is evident from the presence of the executive summary in the record that the Corps considered the report. Extra-record information regarding documents that the agency relies on but were not included in the record is admissible. *S.W. Center for Biological Diversity v. United States Forest Service,* 100 F.3d 1443, 1450 (9th Cir. 1996). Accordingly, the court denies ACC's motion to strike this exhibit.[4]

---

**3.** On the same basis, the court strikes Exhibit C to the Stock Declaration (March 18, 2003 FAA press release and March 18, 2003 article from the Puget Sound Business Journal regarding new aviation forecasts) and Exhibit D to the Stock Declaration (March 24, 2003 article regarding decrease in airline bookings).

**4.** ACC also has moved to strike Exhibit H from the Beale Declaration. The Port does not seriously contest this motion recognizing that the exhibit, a June 9, 2003 letter from the FAA to the Port forwarding comments of the U.S. Department of Agriculture regarding the Pollution Control Hearing Board's suggestion for the development of further in-basin mitigation, is extra-record information. Accordingly, the court strikes Exhibit H to the Beale Declaration.

### C. Corps' decision to issue permit

ACC contends that the Corps' decision to issue the 404 permit was arbitrary and capricious because (1) the Corps failed to incorporate into the permit various conditions placed on the project by the state Pollution Control Hearing Board ("PCHB");[5] (2) the Corps failed to issue a supplemental environmental impact statement regarding new information about future aircraft operations at the airport and possible arsenic contamination of the topsoil in the project area; and (3) the Corps failed to conduct an adequate public interest review before issuing the Section 404 permit.

#### 1. Failure to incorporate PCHB conditions into permit

Under Section 401 of the Clean Water Act, an applicant for a Section 404 permit must provide the Corps with a state certification that the proposed project complies with state water quality standards. 33 U.S.C. § 1341(a)(1). The resulting permit must incorporate any standards or effluent limitations set forth in the certification. *Id.* § 1341(d); *see also Am. Rivers, Inc. v. FERC,* 129 F.3d 99, 110–11 (2d Cir.1997) (stating that agency "does not possess a roving mandate to decide that substantive aspects of state-imposed conditions are inconsistent with the terms of § 401"). If however, the state "fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request," the certification requirements are

waived.[6] 33 U.S.C. § 1341(a)(1); *see also* 33 C.F.R. § 325.2(b)(ii) (reiterating statutory language).

In the present case, the Corps published its final public notice of the application by the Port on January 17, 2001. *See* AR 54088. The Washington State Department of Ecology ("Ecology") issued its certification on September 21, 2001, well within the one-year time period. AR 38698–52.[7] ACC then appealed the certification to PCHB, which issued its decision on August 12, 2002, more than one year after the Corps published its notice. The PCHB decision affirmed the certification but added sixteen new conditions. All parties, including Ecology, have appealed the PCHB's ruling to the Washington State Supreme Court.

When the Corps issued its Record of Decision ("ROD") on December 13, 2002, it incorporated Ecology's certification and seven of the sixteen conditions set forth in PCHB's ruling. According to Defendants, the Corps was entitled to consider PCHB's additional conditions solely in its discretion because the conditions were provided outside the one-year time limit and because they were never included in the state's actual certification, which can only be issued by Ecology.[8] RCW 90.48.260; *see P.R. Sun Oil Co. v. EPA,* 8 F.3d 73, 79 (1st Cir.1993) (holding that where a state issues its certification outside the one-year time frame, EPA can in its discretion adopt the conditions in the final certification into its permit).

---

**5.** The PCHB is a quasi-judicial administrative body created by the state legislature "to provide for a more expeditious and efficient disposition of appeals with respect to the decisions and orders of the [environment] department." RCW 43.21B.010.

**6.** A state may elect to deny certification, in which case no federal permit may issue. 33 U.S.C. § 1341(a)(1) ("No license or permit

shall be granted if certification has been denied by the State.").

**7.** The record in this case is peculiar because it is Batestamped in reverse. Consequently, cites to the record are also reversed.

**8.** Indeed, the grounds for Ecology's appeal to the Washington Supreme Court is that PCHB exceeded its authority by imposing the additional conditions.

ACC contends that the Corps is obligated to incorporate all the PCHB conditions given that they were issued before the Corps issued the permit. According to ACC, Section 401(d) requires the Corps to incorporate all of PCHB's modified conditions because the statutory language states that *"[a]ny* certification provided under this section ... set[ting] forth any effluent limitations and other limitations ... shall become a condition on any Federal license or permit." 33 U.S.C. § 1341(d) (emphasis added).

■ ACC's interpretation, however, runs contrary to the plain statutory language. *See Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("As in all statutory construction cases, [the court] begin[s] with the language of the statute."). That interpretation renders the time bar in Section 401(a) superfluous as it would no longer matter whether a state issued a certification before or after the statutory time period expired. Under ACC's interpretation, the determining factor would be whether the Corps acted before the state finalized its certification. If the time bar is to mean anything, however, it must mean that the issuance of state certification conditions outside the one-year time period must be treated differently than the issuance of such conditions occurring within that period. By reading the time bar out of the statute and transforming the statutory scheme into a race between the Corps and the state certifying agency, ACC's interpretation upsets the statutory scheme. *See Boise Cascade Corp. v. EPA,* 942 F.2d 1427, 1432 (9th Cir.1991) (statutes must be interpreted as a whole, "giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous").

On the other hand, the Corps' interpretation is supported by the plain language of the statute, which reflects clear congressional intent that federal agencies only be bound by state certification conditions issued within one year after notice. The legislative history of Section 401 clearly supports the Corps' position. Section 401, as originally introduced in the House and Senate, did not contain any time limit for state certification. *See* S. 7, 91st Cong. § 14(b) (Jan. 15, 1969); H.R. 4141, 91st Cong. § 14(b) (Jan. 23, 1969). In response to industry concern, an amendment was introduced in the House that would prevent a state from interminably blocking a federal permit. 115 Cong. Rec. 9264 (Apr. 16, 1969). Representative Edmondson, who introduced the amendment, explained that "the State must act, either to grant or to deny the certification ... [and that] [t]he failure by the State to act in one way or the other within the prescribed time would constitute a waiver of the certification required as to that State." *Id.* (statement of Rep. Edmondson); *see also id.* at 9265 ("[T]his amendment guards against a situation where the water pollution control authority ... simply sits on its hands and does nothing ... it has to take affirmative action to consider the matter and to decide to withhold the certificate if it wants to defeat a proposed project.") (statement of Rep. Holifield). The Conference Report, echoed these sentiments, stating that the provision in Section 401 was "to insure that sheer inactivity by the State ... will not frustrate the federal application." H.R. Conf. Rep. 91–940 (1970), *reprinted in* 1970 U.S.C.C.A.N. 2741.

ACC makes much of the comment in the Conference Report that as long as the state undertakes some process, it has avoided "sheer inactivity" and therefore the Corps is obligated to incorporate whatever are the final results of the state process. Such an interpretation, however, is at odds with the purpose of the amended

statutory language. As discussed above, the time limit was inserted in order to avoid a state from interminably blocking a federal permit by stalling the Section 401 certification. Whether a state begins to act but does not complete the issuance of a certification or whether the state entirely fails to act at all, the legislative history of Section 401 makes clear that either of those two situations was unacceptable to Congress because both result in delays in issuing Federal permits. *See* 33 U.S.C. § 1251(f) (declaring the national policy of avoiding unnecessary delays at all levels of government in implementing the CWA); 115 Cong. Rec. 9264 (Apr. 16, 1969) (stating that purpose of amendment is "to do away with dalliance or unreasonable delay" and to require a "yes" or "no") (statement of Rep. Edmondson).

ACC and the State of Washington in an amicus brief contend, however, that it is unreasonable to require that all state proceedings, including judicial review, be finalized within a year. Their concern is that by "foreclosing" state review, a federal permit will incorporate invalid or inconsistent state requirements. For instance, where a state or federal court voids a Section 401 certification after the Corps has already issued its permit or after the passing of the one-year period, the district engineer may consider modifying the permit accordingly in his discretion. RGL 87–03(2)(c). Likewise, if a state alters the conditions in its certification after the federal permit has issued,[9] it is within the district engineer's discretion to modify the federal permit to make it conform to those new state conditions. 33 C.F.R. § 325.7. ACC and the state worry that the district engineer may decide not to modify the federal permit, resulting in conflicting state and federal requirements. The concern is that there will be no resolution to

that conflict because the district engineer's decision is not reviewable by any court. *See City of Olmstead Falls v. U.S. E.P.A.*, 233 F.Supp.2d 890, 905 (N.D.Ohio 2002) (holding that Corps decision not to reevaluate Section 404 permit is unreviewable under the APA); *Missouri Coalition for the Envt. v. Corps of Eng'rs*, 866 F.2d 1025, 1032 n. 10 (8th Cir.1989).

Under the APA, however, an agency decision is not reviewable only where there are no standards against which the decision can be judged. 5 U.S.C. § 701(a)(2) (APA does not apply to "agency action is committed to agency discretion by law"). This exception is "applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. at 26 (1945)); *Or. Natural Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir.1996) ("it's well-settled that the touchstone of reviewability under section 701(a)(2) is whether there's law to apply").

Contrary to ACC's assertion, decisions by the Corps not to modify a permit are reviewable given that there is sufficient law to apply to determine if the Corps acted properly. As specified in 33 C.F.R. § 325.7, the Corps' decision regarding modifications to a permit must be in the public interest. As such, the decision is as reviewable as the Corps' initial decision to issue a permit, which must also be in the public interest. *See* discussion *infra* Section II.C.3. Given that there is adequate law upon which APA review can take place, the court is not persuaded by ACC's and the State's argument. Furthermore, the court notes, that in the case where the federal permit and state water quality certification do result in two sets of different

---

9. *See American Rivers*, 129 F.3d at 108 n. 19 (rejecting argument that a state generally can-

not alter certifications after they have been incorporated into a federal license).

and conflicting requirements, it is the permittee who would most likely approach the Corps to modify the permit to incorporate any stricter state standards so that the permittee would face a consistent set of requirements.

Lastly, in its amicus brief, the State of Washington argues that requiring a state to complete its certification process, including judicial review, within one year violates due process and state sovereignty and puts the CWA in significant tension with the 10th and 11th Amendments. This argument is not persuasive. Under the Corps' interpretation, a state is still free to pursue its own independent avenues for certification and review of certification. Section 401 only impacts the way in which *federal* agencies must respond to a timely state certification. If a state is concerned about losing its ability to inject its requirements into the federal process in a timely manner, the state can take other measures to ensure its involvement. For instance, the state can issue its certification in the form of an independently enforceable order such that at the end of the judicial review process, there are independent state requirements above and beyond the federal requirements.

■■■ Moreover, requiring that states complete their certification process within one year does not implicate either the Tenth or Eleventh Amendments. As for the Eleventh Amendment, it addresses the immunity of states to suit. Nothing in Section 401 implicates sovereign immunity. As for the Tenth Amendment, it only reserves certain powers to the states; "it assuredly does not incorporate a Bill of Procedural Rights for the states." *Ariz. State Dep't of Pub. Welfare v. Dep't of Health, Educ., and Welfare*, 449 F.2d 456,

479 (9th Cir.1971). Nor does the Tenth Amendment prevent the federal government from conditioning a state's participation in the implementation of a federal program. *See, e.g., New York v. United States*, 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Printz v. United States*, 521 U.S. 898, 929, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). A holding that Section 401 requires a state to complete its certification process within one year does not "commandeer" the state's administrative apparatus and therefore does not infringe on the concept of "cooperative federalism" under which the Clean Water Act was passed. *See Hodel v. Va. Surface Min. and Reclamation Ass'n*, 452 U.S. 264, 289, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (noting that a federal law that allows states to enact and administer their own regulatory programs within limits established by federal minimums does not implicate the Tenth Amendment).

Accordingly, the court holds that Section 401 requires that the Corps incorporate only those state certification conditions issued within a year of issuing the notice of the request for certification. *See Sun Oil*, 8 F.3d at 80 n. 4 ("Congress has expressed its intent that the state proceeding must be completed in a year."). The Corps need only incorporate such conditions issued after a year solely in its discretion. Therefore, the Corps was not obligated to adopt all of PCHB's additional conditions.

### 2. Failure to file supplemental EIS

ACC contends that the Corps violated the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370f ("NEPA"), by failing to supplement the final environmental impact statement ("EIS") and final supplemental EIS prepared by the FAA in 1996 and 1997 for the 3RW Project.[10] Under

---

**10.** NEPA requires that every federal agency prepare an environmental impact statement for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332. In the present

NEPA, the Corps, as the cooperating agency, is entitled to adopt the EIS of the lead agency when, after an independent review of the statement, the Corps concludes that its comments and suggestions have been satisfied. 40 C.F.R. § 1506.3(c). If the Corps finds "substantial doubt as to [the] technical or procedural adequacy or omission of factors important to the Corps decision," the Corps must prepare a supplemental EIS. 33 C.F.R. § 230.21. Furthermore, an agency must prepare a supplemental EIS if there are "substantial changes in the proposed action that are relevant to environmental concerns; or ... [t]here are significant new circumstances or information relevant to *environmental* concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1) (emphasis added); *cf.* 33 C.F.R. § 230.11(b).

### a. *Projected need*

According to ACC, the Corps should have issued a supplemental EIS in light of "new data, projections and decisions [that] show that the 3RW is not needed to fulfill the purpose and need identified [because that new information] fundamentally alter[s] the consideration of environmental impacts versus project benefits that is at the heart of the NEPA process." [11] Pl.'s Reply at 28. ACC points to evidence in the record that shows that since the EIS was originally issued, there has been a dramatic and sustained drop in flights and delays at the airport even prior to the events of September 11, 2001, that new

technology can reduce delays despite increased flight operations, and that "sweeping changes" in the airline industry obviate any need for the project.

Under NEPA, however, a federal agency "need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decision-making intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Rather, the decision whether to prepare a supplemental EIS is based on whether "the new information is sufficient to show that the remaining action will 'affec[t]' the quality of the human environment' in a significant manner *or to a significant extent not already considered." Id.* at 374, 109 S.Ct. 1851 (emphasis added); *Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1152 (9th Cir.1998) ("The standard for a supplemental EA and EIS is whether there have been significant changes in the proposed action.").

■ In the present case, the "new information" consists of updated and somewhat conflicting forecasts regarding aircraft operations. None of this information, however, changes any environmental impact for the proposed project. As the Corps correctly recognized, the project definition and scope have largely remained the same, as have the projected environmental impacts. AR 54002 (the footprint of the pro-

---

case, the FAA is the lead agency and the Corps is a cooperating agency.

**11.** ACC also argues that the FAA's analyses are stale in light of the FAA's own Airport Environmental Handbook that states that "a written reevaluation of the continued adequacy, accuracy, and validity of the final statement shall be made at each major approval point which occurs more than 3 years after

approval of the final statement and a new supplemental statement prepared, if necessary." FAA Order 50.50.4A, ch. 102(b)(2), *at* http://www1.faa.gov/arp/app600/5054a/chap 10.htm (last visited July 19, 2003). The FAA, however, revisited the issue of the 3RW Project in 2001 when it issued a revised ROD reaffirming its initial EIS. The EIS, therefore, is not "stale."

posed project unchanged since FSEIS), 54001 (while "design modifications represent changes to the project, they do not represent substantial changes relevant to environmental concerns"). Consequently, no supplemental EIS is necessary. *Idaho Sporting Cong.*, 137 F.3d at 1152 (no supplemental EIS is required where the impact of the proposed federal action was already considered in an earlier EIS).

ACC contends, however, that a supplemental EIS is necessary because the new and updated forecasts regarding aircraft operations at the airport undermine the previous impact statements to such an extent that the Corps could no longer rely on those documents. An original EIS, however, "is no longer 'adequate as a source of information necessary to a rational decision on the relative risks and benefits' of a proposed action *not* because it fails to 'include' new information or any 'evaluation' of it, but because the new information presents a seriously different picture of the likely environmental harms stemming from the proposed action." *Wisconsin v. Weinberger*, 745 F.2d 412, 420 (7th Cir. 1984) (emphasis added).

■ As discussed above, ACC's new information does not present a seriously different picture of the likely environmental harms, but rather challenges the propriety and rationality of the Corps' decision to permit a project with ostensibly large environmental impacts and few benefits. ACC cannot challenge the adequacy of those statements by attempting to inject into them a cost/benefit analysis that was not present in the first place. *See* AR 56800–799 (Port's final EIS rejecting alternatives on bases other than cost). A cost/benefit analysis is not required as long as the EIS provides sufficient information regarding the environmental impacts of the proposed

projects to aid decision-makers. *Trout Unlimited v. Morton*, 509 F.2d 1276, 1286 (9th Cir.1974) (finding EIS adequate where it was "sufficiently detailed to aid the decision-makers in deciding whether to proceed or not and to provide the information the public needs to enable both those who would challenge, and those who would support, the project to respond effectively."). Here, the EIS adequately discusses the project's environmental consequences. *See* AR 56724–326 (discussing environmental consequences of project, including noise impacts, archaeological and cultural impacts, social impacts, health impacts, water quality impacts, farmland impacts, surface transportation impacts, threatened and endangered species impacts, construction impacts, etc.). Given that those environmental consequences have not changed, the underlying statements are adequate despite new information challenging the cost basis for the project as a whole. *Idaho Sporting Cong.*, 137 F.3d at 1152. The Corps, therefore, did not act arbitrarily and capriciously in determining that no supplemental impact statement was necessary in light of ACC's new information.

b. *Arsenic contamination*

ACC also contends that the Corps should have issued a supplemental impact statement because the Corps was presented with new information regarding widespread arsenic and lead contamination in the topsoil of the project area that would likely be disturbed by construction activities.[12] When such new information about an environmental impact comes to light, the Corps "must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require implementation of formal NEPA

---

12. The contamination is allegedly the result of the operation of the ASARCO smelter in Tacoma that operated from 1905–1986 and has been found to have contaminated, to varying degrees, areas in south King County including the project area.

filing procedures." *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1024–25 (9th Cir.1980). The reasonableness of the Corps' decision "depends on such factors as the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data." *Id.* If "the plaintiff raises substantial questions whether a project may have a significant effect, an EIS *must* be prepared." *Steamboaters v. FERC,* 759 F.2d 1382, 1392 (9th Cir.1985) (emphasis in original).

■ In the present case, the new information about arsenic and lead fails to raise substantial questions about the project's effects. ACC points to three letters in the record by Greg Wingard, director of Waste Action Project, to support its contention that the arsenic-contaminated soil is a substantial environmental impact that the Corps has not addressed. AR 53418–13, 53496–93, 51644–38. In only *one* of these letters does Wingard mention the *possibility* that construction activity will disturb the arsenic in the soil and cause an environmental impact. AR 53414 ("Witnesses and available Port records have noted dust in the air and truck drag out on local roads from Port construction activities."). Aside from this statement, though, there is no expert opinion or actual proof that fugitive dust will be a problem with the project. *See Sierra Club v. Slater,* 120 F.3d 623, 633 (6th Cir.1997) (stating that supplemental EIS not required where plaintiff sets forth "unsupported views about the effect of various factors").

Furthermore, it is readily apparent from the record that the Corps considered these environmental impacts and found them to be insignificant in light of various mitigation measures that would

be put in place. AR 54077 (discussing Stormwater Pollution Prevention Plan and the dust control required therein), 54034 (discussing mitigation of construction impacts including efforts to minimize the amounts of fugitive dust emissions by covering loads, watering, and washing), 54004 (discussing that no arsenic-contaminated soil would be used for fill for the project), 51722–21 (discussing Topsoil Management Plan that includes "construction erosion and sedimentation controls which will prevent the migration of impacted sediment and soil particles to surface water or the air.... [including] water spraying as appropriate to maintain dust control."); *see also Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105, 1121 (9th Cir.2000) ("In evaluating the sufficiency of mitigation measures, we focus on whether the mitigation measures constitute an adequate buffer against the negative impacts that result from the authorized activity to render such impacts so minor as to not warrant an EIS."). It is clear from the record that the Corps carefully considered this issue and its decision that no supplemental EIS was necessary was not arbitrary and capricious. *Wetlands Action Network,* 222 F.3d at 1121 (no impact statement is needed when sufficient mitigating measures are put in place); *Slater,* 120 F.3d at 633 (no supplemental EIS needed when agency considers effects but reaches a different conclusion from plaintiffs regarding those effects).

### 3. Failure to conduct adequate public interest analysis

Corps regulations require it to evaluate the probable impacts of a proposed activity on the public interest. 33 C.F.R. § 320.4(a)(1). Such an evaluation

requires a careful weighing of all those factors which become relevant in each particular case. The benefits which rea-

sonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process.

*Id.* If a permit would be contrary to the public interest, it must be denied. *Id.*

In the present case, ACC contends that the Corps failed to conduct an adequate public interest analysis because the Corps failed (1) to independently evaluate the need for the 3RW Project; (2) to properly conduct an alternatives analysis; (3) to consider current cost data for the project; (4) to adopt fill criteria adequate to protect water quality; and (5) to properly assess the impacts of the project on wetlands.

■ As a reviewing court, this court must give the Corps' determinations substantial deference. *Town of Norfolk v. United States Army Corps of Eng'rs,* 968 F.2d 1438, 1454 (1st Cir.1992) ("Under the 'public interest' review, the Corps conducts a general balancing of a number of economic and environmental factors and its ultimate determinations are entitled to substantial deference."); *Envtl. Coalition of Broward County, Inc. v. Myers,* 831 F.2d 984, 986 (11th Cir.1987). "In reviewing this public interest determination by the Corps, it is not [the court's] role to second-guess.... [but to] merely consider whether the Corps followed required procedures, evaluated relevant factors and reached a reasoned decision." *Van Abbema v. Fornell,* 807 F.2d 633, 636 (7th Cir.1986).

### a. The need for the 3RW Project

According to ACC, the Corps failed to conduct an adequate and independent analysis of the need for the 3RW Project. *See* 33 C.F.R. § 320.4(a)(2)(i) (public interest analysis must include a determination of "the relative extent of the public and private need for the proposed structure or work"). ACC points to the effect of September 11, 2001 and the subsequent and sustained dramatic drop in flights and the reduction of airline operations to support its claim that the project is not needed. ACC further contends that the project is not needed given technology that can reduce delays despite increased flight operations.

■ In conducting its public interest analysis, the Corps had before it the FAA's conclusions that the 3RW Project was necessary to ensure safety and reduce delays given the fact that the airport's current two runways are located only 800 feet apart and that poor weather, not aircraft operations, is the main cause of delays. *See, e.g.,* AR 14358 ("The Puget Sound region of Western Washington is renowned for its poor weather, characterized by frequent precipitation, clouds and fog"). Such an opinion is entitled to great deference from the Corps. 33 C.F.R. § 320.4(j)(4) ("another federal agency's determination to proceed is entitled to substantial consideration in the Corps' public interest review"); *Crutchfield v. County of Hanover,* 325 F.3d 211, 2003 WL 1564383, at *11 (4th Cir.2003) (Corps may rely on proponent studies regarding the project need). It was not arbitrary and capricious for the Corps to accept these conclusions. *See City of Los Angeles v. FAA,* 138 F.3d 806, 807 (9th Cir.1998) (predicting demand for an airport in 15 years is a prognostication that is due deference).

Despite the fact that the Corps could have given deference to the FAA's needs determination, the record reveals that the Corps did in fact conduct an independent review of the project need. The Corps took note of ACC's criticisms, noting the concerns about the effect of September 11, the economic downturn in the airline in-

dustry, and the reduction in number of aircraft operations. The Corps asked the Port to respond. AR 41537. The Port did. AR 43793–30. The Corps also sought the FAA's analysis of these issues. *See, e.g.,* AR 37071–70, 31323–20. The FAA also responded. AR 33146–43, 38631–27, 51736–30. Clearly, ACC and their expert, Dr. Stephen Hockaday, paint a different picture of the future of air travel than the Port and the FAA. However, it is not the role of this court to resolve scientific disagreements between ACC's expert and the Corps' experts. *Friends of the Earth v. Hall,* 693 F.Supp. 904, 922 (W.D.Wash.1988). The record makes clear that the Corps followed required procedures, evaluated relevant factors and reached a reasoned decision. AR 53884–82, 53993–92.

b. *Failure to conduct adequate alternatives analysis*

 By law, the Corps must evaluate alternatives to a proposed project in deciding whether a permit should issue. 42 U.S.C. § 4332(2)(E); 33 C.F.R. § 320.4(a). According to ACC, had the Corps properly examined alternatives, it would have found one that is less environmentally harmful. The specific alternative that ACC contends the Corps neglected is one where the FAA would utilize technology and various demand-management techniques to handle increased capacity and reduce poor-weather delays. The record reflects, however, that the Corps did consider these alternatives and concurred with the Port that they did not meet the project need. AR 53992–91, 53871–70, 53878–63. ACC fails to point to any evidence in the record to challenge these conclusions.[13] In fact, the

source of ACC's proposed alternative is the FAA itself, which after raising the alternative, discounted it as not being a viable solution to solving the *total* poor weather problem. AR 36649. Furthermore, the Corps specifically requested additional information from both the Port and FAA regarding alternatives on several occasions. AR 53993; *see, e.g.,* 33146–45 (FAA letter in response to Corps request for more information regarding new technologies), 31108 (FAA response rejecting suggestion that new technologies obviate the need for the third runway). Consequently, the Corps conducted an adequate alternatives analysis.

c. *Failure to request current cost estimates*

In line with its attack on the Corps' decision not to issue a supplemental EIS, *see* discussion *supra* at 20, ACC also attacks the Corps' decision not to require the Port to submit updated costs estimates for the project. According to ACC, without those costs estimates, the Corps could not have properly conducted that analysis, which is required to include a consideration of the economics of the project. 33 C.F.R. § 320.4(a)(1). Where "a proposal's benefits are entirely economic and its costs environmental, the Corps must make at least a minimally reliable effort to establish economic benefit." *Van Abbema,* 807 F.2d at 639.

 Here, however, the benefits are not entirely economic. Rather they include such intangibles as air travel safety, increased traveler convenience, and reduced poor-weather delays. Furthermore,

---

**13.** In its reply brief, ACC points to statements by Alaska Airlines' Vice President of Flight Operations that new technology could alleviate poor-weather flight delays at SeaTac without the need for a third runway. This "evidence," however, is extra-record evidence that does not fall within any of the exceptions provided by the Ninth Circuit for such evidence. *See* discussion *supra,* at 3. Consequently, the court will not consider how such evidence weighs on the wisdom of the Corps' decision. *Asarco,* 616 F.2d at 1160.

cost was not a determinative factor in comparing practicable alternatives. *See* AR 53872–63 (evaluating alternatives and rejecting them as failing to meet the project need), 53991 (cost was not an important factor in comparing alternatives); *see also* AR 14356 (recognizing that while costs for the project are high, the project is nevertheless cost-effective in light of the goals of relieving passenger and public inconvenience and making travel to and from the region more attractive by reducing delay and uncertainty endemic by the region's poor weather). Consequently, the economics of the project were not as relevant to the Corps' public interest analysis than if cost had been a determinative factor.[14] Therefore, the court finds that the Corps did not act arbitrarily and capriciously when it did not ask the Port for updated cost estimates. *Van Abbema,* 807 F.2d at 636 (court cannot second-guess the Corps where the Corps followed the required procedures, evaluated relevant factors, and reached its own reasoned decision).

d. *Failure to require adequate fill contamination criteria*

ACC contends that the Corps did not properly assess the impact of the use of contaminated fill and did not properly impose stricter limitations on the use of such fill. Under the Section 404(b)(1) Guidelines, the Corps must prohibit any discharge of fill material that "causes or contributes ... to violations of any applicable State water quality standard" or "[v]iolates any applicable toxic, effluent standard or prohibition." 40 C.F.R. § 230.10(b). In its permit, the Corps deemed the fill crite-

ria that were provided in Ecology's original certification sufficiently protective of the aquatic environment. AR 54003. In doing so, the Corps rejected more stringent criteria that were announced by the PCHB in its ruling on the appeal of Ecology's certification. ACC contends that the Corps should have adopted PCHB's stricter criteria and that it acted arbitrarily and capriciously by "concluding without analysis" that Ecology's standards were sufficiently protective.

■■■ This court will uphold the Corps' decision regarding the fill criteria provided there is a rational basis for that decision in the record. *Hintz,* 800 F.2d at 831. Certainly there is disagreement in the record among the experts over which requirements—the Corps' or PCHB's—adequately protect aquatic resources. Again, this court "is not in the business of resolving scientific disagreements between plaintiffs' experts and the Corps' experts." *Friends of the Earth,* 693 F.Supp. at 922. Here, the Corps' analysis relied on the judgement of the experts at Ecology.[15] Such reliance is not arbitrary and capricious even in light of PCHB's imposition on appeal of stricter standards. In the present case, the record reveals that the district engineer considered the stricter standards and rejected them. There is a rational basis for this decision. For example, PCHB's requirements for selenium, chromium, and silver are lower than local natural background levels in the Puget Sound area. In setting those requirements, PCHB used *statewide* rather than *regional* background levels. *Compare* AR 52324

---

14. ACC makes much of a Corps decision rejecting a Section 404 permit for a proposed landfill because the initial cost information was inadequate. AR 53010. That decision, however, was based on the fact that the proponent of the landfill project stated that cost was the defining factor for determining the practicability of an alternative. AR 53991.

As discussed above, cost was not a defining factor in deciding the practicability of alternatives. Consequently, cost information is not as relevant.

15. ACC points out that there is disagreement even within Ecology regarding the adequacy of the standards issued in the certification.

(PCHB criteria), *with* AR 52566 (table of statewide and regional background levels). The result would be that the Port would have to use fill that is cleaner than the soils in the surrounding area. The Corps correctly rejected those criteria as being unreasonable. The Corps also considered PCHB's other criteria and likewise rejected the stricter criteria as not being necessary to protect aquatic resources. AR 54069. Instead, the Corps deemed the criteria proffered by Ecology and by the Fish and Wildlife Service to be adequate and adopted them. ACC fails, therefore, to demonstrate that the Corps acted arbitrarily and capriciously in setting fill criteria for the permit.

ACC also challenges the Corps' decision to allow the use of the Synthetic Precipitation Leaching Procedure ("SPLP") to test whether a particular contaminant in the fill material will leach at rates potentially threatening to water quality. In its order, PCHB prohibited the use of SPLP as being inadequate for the protection of aquatic resources.[16] According to ACC, it was therefore arbitrary and capricious for the Corps to allow the use of SPLP.

SPLP, however, is a scientifically recognized field test. It has been adopted and used by EPA and is cited in both state and federal regulations as being an appropriate test. *See* WAC 173–340–747; EPA Publication No. SW–846. Thus, it is clear that there is a reasonable basis for the Corps' decision.[17]

### e. *Failure to assess impacts to wetlands*

ACC contends that the Corps failed to require sufficient mitigation to assure no net loss of wetland function. According to ACC, the Corps failed to properly calculate the net areal loss that will occur as a result of the 3RW Project and failed to provide an adequate functional analysis of the wetlands mitigation plan. ACC also argues that the Corps improperly set the width of upland buffers and that the Corps failed to properly engage in a cumulative impact analysis.

### (1) *Failure to properly calculate net areal loss*

Under the CWA, the Corps must minimize the damage to wetlands that result from the issuance of a Section 404 permit. One way to accomplish this is through compensatory mitigation, such as restoration of existing degraded wetlands or creation of manmade wetlands. Memorandum of Agreement Between the Environmental Protection Agency and the Department of the Army Concerning the Determination of Mitigation Under the Clean Water Act Section 404(b)(1) Guidelines § II.C.3 ("Mitigation MOA"). Toward that end, the Port submitted its Natural Resource Mitigation Plan ("NRMP").

ACC contends that the Corps improperly calculated the amount of wetlands that

---

**16.** On May 9, 2003, the governor of Washington signed into law SSB 5787 that expressly allows the use of SPLP in construction projects such as the 3RW Project. 2003 Wash. Laws ch. 210. Whether SSB 5787 is a valid exercise of the Washington legislature's power is a question currently before the Washington Supreme Court and is not of concern here.

**17.** ACC makes much of the fact that Washington regulations approve SPLP for testing for

only nine metals, leaving five metals from the Section 401 certification for which the test is inappropriate. However, that fact alone, does not make allowing the test to be used for the 3RW Project arbitrary and capricious as long as there is nothing that specifies that SPLP is the *only* test to be used. ACC makes no allegations that that is the case. Consequently, it cannot be arbitrary and capricious to allow use of that test in conjunction with other tests that will ensure adequate protection of aquatic resources.

will be lost as a result of the 3RW Project. There is, however, no requirement that the Corps consider the *area* of wetlands lost in evaluating a mitigation plan, only that there be no net loss of wetlands *function.* Mitigation MOA § II.B (the Corps must strive "to achieve a goal of no overall net loss of [wetland] values and functions"); *see also* 40 C.F.R. §§ 230.10(c)(1)-(4), 230.11 (discussing consideration of functional losses, not losses in acreage); Exec. Order No. 11,990 § 1(a), 42 Fed.Reg. 26,-961 (May 24, 1977), *reprinted in* 42 U.S.C. § 4321 at 466–68 (requiring federal agencies to consider specific functions performed by wetlands, not impacted acreage, in their efforts to "minimize the destruction, loss or degradation of wetlands").

Despite this, ACC alleges that the Corps undercounted the acreage of impacted wetlands by 1.75 acres. ACC makes much of a statement by the Corps that "[i]n some instances, areal impacts will occur to a wetland to such an extent (e.g. 70% or more of the wetland is impacted) the remaining portion of the wetland becomes substantively impaired." AR 53826. According to ACC, the Corps should have considered three wetlands as being completely impacted given the fact that the actual impacts exceed 70 percent of the wetlands' acreage.[18]

■ However, it is clear from the Corps' statement that it is not meant to be a bright-line rule. First, the statement is prefaced with a condition that it only applies "in some instances." Second, the "rule" does not provide any bright-line cutoff for the percentage of acreage that must be impacted but rather suggests ("e.g.") one such value as an example. Furthermore, whether a wetland is indirectly impacted when a large portion of it has been directly affected is specific to each wetland. ACC produces no specific evidence that the Corps undercounted impacted wetlands. Consequently, this court defers to the Corps' determination. *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 556 (9th Cir.2000) (deference "is especially appropriate where ... the challenged decision implicates substantial agency expertise").

#### (2) *Failure to properly account for net functional loss*

■ ACC also contends that the Corps' functional analysis is flawed because it fails to sufficiently quantify the net gain or loss of wetlands functions for the Port's mitigation plan. First, ACC contends that the Corps merely deferred to the Port's NRMP. It is readily apparent from the record, however, that the Corps initially found the Port's NRMP inadequate. AR 53833–32. The Corps repeatedly requested more information and analysis from the Port. *Id.* at 53832. The Corps finally undertook its own independent functional assessment and impact analysis. *Id.* The Port eventually incorporated the Corps' concerns in a revised mitigation plan. *Id.* The record, therefore, does not support ACC's contention that the Corps simply deferred to the Port.

Furthermore, there is no evidence in the record to support ACC's contention that the Corps acted arbitrarily and capriciously by performing a purely qualitative functional analysis. In performing its analysis, the Corps utilized a methodology that consisted of a series of subjective descriptions of the wetlands and the functions they

---

**18.** For instance, ACC contends that the Corps wrongly considered only 3.74 of wetland Al's 4.02 acres impacted when it should have considered all 4.02 acres impacted under the 70% rule (3.74 is 93% of 4.02, and so under the 70% rule, the entire wetland should be considered impaired). This would result in an undercount of 0.28 acres of impacted wetland.

serve. According to ACC, the Corps should have used a quantitative methodology that would more accurately calculate the loss or gain in wetlands function. ACC points to a National Research Council study titled *Compensating for Wetlands Losses Under the Clean Water Act,*[19] which rejects the subjective approach used by the Corps in favor of a more "science-based" quantitative numeric indexing approaching to compare wetlands functions to ensure the equivalency of the compensatory mitigation.

The Corps' selection of methodology, however, is not plainly wrong in light of the guidance provided within the Corps' Ecosystem Management and Restoration Information System ("EMRIS").[20] Through that guidance, Corps personnel wishing to establish mitigation/compensation ratios are instructed to select from up to 10 different methodologies. The choice of methodology is further narrowed by the geographic region and the general habitat type to which it will be applied. Of the methodologies included in EMRIS, only eight can be used within the State of Washington without further modification, and only three of those are quantitative.[21] Exs. 5 & 7, Williams Decl. None of the three quantitative methodologies qualified for Washington, however, have been tailored to the slope wetlands that make up 30 percent of the impacted wetland acreage. AR 53752. Contrary to the ACC's contention, therefore, the Corps did not act arbitrarily and capriciously when it selected a modified Hydrogeomorphic Functional Assessment Methodology

("HGM"), which is described as "technically the most progressive and extensive effort among the wave of recent procedures ... developed to satisfy the requirements of the 404 Program." Ex. 4, Williams Decl. at 1. The choice of methodology is clearly an area within the Corps' expertise to which this court defers. *Inland Empire Pub. Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993) ("We defer to agency expertise on questions of methodology unless the agency has completely failed to address some factor."); *Friends of the Clearwater,* 222 F.3d at 556 (deference "is especially appropriate where, as here, the challenged decision implicates substantial agency expertise"). Accordingly, the court finds that the Corps adequately accounted for net functional loss of wetlands.

(3) *Failure to provide adequate upland buffers*

■ As part of the mitigation package, the Corps required the Port to set aside and/or enhance buffer zones around the impacted wetlands. The Corps gave credit for the value of these upland buffers in determining the extent of the need for compensatory mitigation. ACC challenges these credits. First, ACC points out that the land in those buffers is already protected by local and state law so that there is no added environmental value to these buffers. However, ACC does not point to any statute or regulation prohibiting the Corps from giving credit for buffers that are already protected by local and state law, especially where the Corps requires that those buffers be enhanced. The Miti-

---

**19.** Natl. Academy Press, 2001, partially reprinted at PCHB AR 54618–27.

**20.** EMRIS is a source of technical information for the Corps' permitting program that publishes an online manual that instructs Corps districts on, *inter alia,* quantitative methods for assessing wetlands subject to

Section 404 permitting. *See* EMRIS, *at* http://www.wes.army.mil/el/emrrp/emris/emrishelp.htm.

**21.** The eight methodologies include EPW, HEP, IVA, OFWAM, PFC, Synoptic, WAFAM, and WET. Of those eight, the three quantitative methodolgies are EPW, HEP, and WAFAM.

gation MOA cited by ACC does not support ACC's position. That MOA states that in situations where compensatory mitigation required by another agency's permit overlaps with mitigation considered by the Corps, "the Corps may consider that mitigation as part of the overall application for purposes of public notice." Mitigation MOA § II.C.3. Furthermore, the Corps' conditions require that the ecological value of the buffers be enhanced. AR 53762; 43542–33 (describing buffer enhancements such as removing structures and impervious surfaces, controlling invasive vegetation, in-fill planting). The Corps' requirements, therefore, go above and beyond the current level of protection afforded by state and local law.

Next, ACC takes issue with the Corps' selection of 100 foot buffers rather than the 150 foot buffers recommended by the Fish and Wildlife Service ("FWS"). The conservation measures recommended by FWS, however, are "nonbinding suggestions that a Federal agency may elect to implement in its proposed action." 51 Fed.Reg. 19,926, 19,931 (June 3, 1985); *see also* FWS Biological Opinion at 52 (AR 36543) ("Conservation recommendations are discretionary agency activities."). Moreover, 100–foot buffers are supported by the scientific literature. AR 54061. Contrary to ACC's assertion that the Port and Corps fail to follow the recommendations embodied in that literature, the court finds that the literature adequately supports the position that 100–foot buffers provide ecological benefits. *See* AR 43631–27 (collecting and summarizing scientific literature that demonstrates ecological benefits for buffers up to 100 feet).

Put simply, this court will not substitute its judgment as to the effectiveness of the mitigation measures for that of the Corps. *Sierra Club v. Alexander,* 484 F.Supp. 455, 468 (N.D.N.Y.1980). Given the studied and expert decision announced by the Corps that the mitigation measures are adequate, and given that the record demonstrates that the Corps considered the relevant environmental data and factors in reaching that decision, the court finds that the Corps did not act arbitrarily and capriciously regarding the adequacy of the buffers.

(4) *Corps' approval of out-of-basin mitigation*

Under the Corps' regulations, the Corps is authorized to employ off-site mitigation. 33 C.F.R. §§ 320.4(r)(1), 325.4(a)(3); *see also* Mitigation MOA § II.C.3 ("If on-site compensatory mitigation is not practicable, off-site compensatory mitigation should be undertaken in the same geographic area if practicable."). ACC contends that the Corps' decision to use the Auburn site was arbitrary and capricious given that the Auburn wetland is not in physical proximity to the impacted areas, is not in the same watershed, and is not a similar wetland. ACC further contends that there are sufficient and adequate in-basin alternatives that should have been adopted instead.

■■■ The record demonstrates, however, that the Corps considered the relevant environmental data in reaching its decision. The purpose of the Auburn wetland is to provide displaced avian habitat. Such habitat cannot easily be located near the impacted area because birds pose a threat to aircraft operations. *See* FAA Advisory Circular No. 150/5200–33 at § 1–3, *reprinted in* AR 1464 (mitigation projects within 10,000 feet of an airport that have the potential to attract birds that might pose a threat to aircraft should not be approved); *see also* AR 9305–00 (Aircraft Safety MOU). ACC points to Paine Field, a county airport located in Everett, Washington as an example that on-site mitigation is possible. A county airport, however, has considerably different traffic

patterns than Seattle–Tacoma International Airport. Conditions at one field do not necessarily reflect conditions at another. *See* AR 9222 ("considering the number and type of aircraft operations, the number of commercial passenger flights, and the quality and character of the existing wetlands ... on-site mitigation of the wetland wildlife habitat function would not be compatible with the safe operation of the [SeaTac] airport"), 9219 ("The number of operations at Sea–Tac is an important consideration. Although there is not necessarily a linear relationship, common sense dictates that increasing either the number of planes or the number of birds at a particular airport will increase the probability of an aircraft/bird collision."). Furthermore, the on-site mitigation at Paine Field was not habitat replacement. AR 9220. Rather, all waterfowl and other potentially hazardous wildlife habitat replacement was to take place at a site 10,000 feet from the airport. *Id.* Thus, the mitigation at Paine Field is consistent with the proposed mitigation for the 3RW Project. In both cases, the Corps approved off-site habitat replacement mitigation after considering the risk of bird strikes.

Furthermore, it was not arbitrary and capricious to reject other areas for mitigation in light of a finding that those areas are unsuitable or impracticable. ACC takes issue with the Port's and the Corps' consideration of only those sites that are 10 or more acres in size. According to ACC, many smaller sites are suitable for mitigation and should have been included in lieu of the off-site mitigation. ACC points to their own expert's testimony that numerous smaller wetland areas may provide more overall wetland functions than concentrating mitigation in a single large site. AR 56919. While this may be true, it is also the case that the areas that ACC

suggests are already heavily developed. The Port and the Corps found that a network of small and fragmentary mitigation sites would not adequately compensate for the functional losses associated with the development. AR 53811 ("the opportunities for in-basin mitigation to compensate the impact are very limited"). Given the impracticability of in-basin mitigation, it was entirely reasonable for the Corps to require out-of-basin mitigation. *See* AR 53843 (search "was fairly exhaustive .... [n]o other suitable sites were closer."); Wash. Dep't of Ecology, *Alternative Mitigation Policy Guidance Interagency Implementation Agreement*, Pub. # 02–06–007 at 10 (Feb.2000) ("Acceptable off-site mitigation must occur in the same Water Resource Inventory Area (WRIA), basin or sub-basin as the impacts, depending on affected functions, but not necessarily directly adjacent to the impacts.").[22]

(5) *Failure to properly perform cumulative impacts analysis*

Finally, ACC contends that the Corps merely rubber-stamped the Port's cumulative impacts analysis, thereby failing to provide a competent analysis as required by its own regulations. After EPA noted that the Port's submission to the Corps lacked any cumulative impacts analysis, both the Port and the Corps conducted such an analysis. In light of its analysis, the Corps concluded that "while the proposed project and mitigation does not reverse the past adverse impacts having occurred in these watersheds, it does not further contribute to the degradation of the aquatic environment, except for passerine bird and waterfowl habitat. Mitigation for these impacts are provided at the off-site mitigation in Auburn." AR 54039.

---

**22.**　http://www.ecy.wa.gov/pubs/0306007.pdf. The Auburn site and the 3RW Project site are all in the same WRIA.

There is simply no evidence in the record that the Corps adopted the Port's analysis without any consideration. A cursory analysis of the Port's and Corps' assessments reveals that they are quite different. *Compare* AR 54054–39, *with* AR 37416–333. While the Corps may have used the underlying information in the Port's analysis as a foundation for its own assessment, such reliance is not an unlawful shirking of responsibility. *Friends of the Earth v. Hintz,* 800 F.2d 822, 834 (9th Cir.1986).

## III. CONCLUSION

For the foregoing reasons, the court finds that the Corps did not act arbitrarily and capriciously in issuing the Section 404 permit to the Port of Seattle. The Corps' and Port's motions for summary judgment [docket nos. 50 & 51] are GRANTED. ACC's motion for summary judgment [docket no 43] is DENIED.